UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

IVAN DEXTER POINTER,

        Plaintiff,

    v.

BANK OF AMERICA, N.A.,

        Defendant.

No.  2:14-CV-00525-KJM-CKD

ORDER

In two separate motions, plaintiff Ivan Dexter Pointer moves for: (1) final approval of the class action settlement, (2) an incentive award, (3) an administration award, and (4) an award of attorneys' fees and costs.  Mot. Att'ys' Fees, ECF No. 50; Mot. Final Approval, ECF No. 51.  The motions are unopposed, and the court considers them together here.  The court held a hearing on October 7, 2016.  Michael Righetti appeared for Pointer.  Regina Musolino appeared for Bank of America, N.A. (hereinafter, BANA).  As explained below, the court GRANTS both motions.

I.      BACKGROUND

Pointer worked for BANA as a non-exempt Home Service Specialist.  In this action, Pointer claims he and similarly situated Home Service Specialists were wrongly underpaid due to BANA's policy of excluding bonuses when calculating overtime pay.  *See generally* First

1

1   Am. Compl. (FAC), ECF No. 1-1.  Pointer also seeks statutory penalties under the California

2   Private Attorneys General Act (PAGA), California Labor Code §§ 2698 *et seq.  Id.* ¶¶ 63–66.

3           Pointer filed his original complaint in Sacramento County Superior Court in late

4   2013, and the case was removed to this court in February 2014.  Notice of Removal, ECF No. 1.

5   The court set a schedule for a hearing on a motion for class certification, but the parties first

6   reached preliminary settlement after private mediation in March 2015.  Rep. May 29, 2016, ECF

7   No. 34.  Pointer's claims originally included "off the clock" work allegations, which were

8   dropped after discovery.  Mot. Final Approval 8.  Thus, the settlement agreement releases only

9   Pointer's overtime pay claims.  Other than a brief discovery dispute, no other pretrial litigation

10  has occurred.  *See* Mot. Compel, ECF No. 16; Jnt. Stmt., ECF No. 18; Order Nov. 20, 2014, ECF

11  No. 22.

12          Since removing the case, BANA has asserted that Bank of America, N.A., is the

13  only proper defendant and that Pointer merely named various iterations of the same entity in his

14  complaint.  *See* Notice of Removal 2 n.1.  Consistent with that observation, the settlement

15  agreement considered here was entered into only by Bank of America, N.A.  *See* Righetti Decl.

16  [Preliminary] 36 Ex. 1, Jnt. Stip. Settlement, ECF No. 38-2.  Moreover, Bank of America, N.A.,

17  is the only defendant to have appeared before this court.  Notice of Appearance, ECF No. 27.

18  Accordingly, the court dismisses all other defendants named in the complaint, including "Bank of

19  America National Association" and "Bank of America National Assoc."  FAC.

20          A.      Preliminary Settlement Approval

21          As a functional matter, a review of a proposed class action settlement generally

22  involves two hearings: (1) an initial hearing to determine whether certification and preliminary

23  approval of the settlement are justified and, after notice has been provided to the class, (2) a final

24  fairness hearing to determine whether final approval is appropriate.  Manual for Complex

25  Litigation, Fourth (MCL) § 21.632 (2004).  In August 2015, Pointer moved for preliminary

26  approval of the class action settlement.  Mot. Prelim. Approval, ECF No. 38.  After conducting

27  the initial hearing, the court issued its February 22, 2016 order, which preliminarily approved the

28  proposed settlement on a class basis, appointed Pointer as class representative and Rust

Consulting as the claims administrator, and preliminarily approved the notice and claim forms to be sent to class members.  Prelim. Approval Order (Order), ECF No. 47.  The court's order noted the parties' stipulated class definition:

> (a) the "Overtime Class," which shall include all persons, from December 10, 2009 through the date of preliminary approval of this settlement by the court ("Overtime Class Period") who (1) worked for BANA in California as an overtime-eligible Home Service Specialist; (2) received a bonus payment pursuant to BANA's APIP [Associate Performance Incentive Plan] bonus plan for work performed as an overtime-eligible Home Service Specialist; (3) worked overtime during the time period covered by any bonus payment pursuant to BANA's APIP bonus plan for work performed as an overtime-eligible Home Service Specialist; and (4) has not previously signed a severance agreement and release; and

> (b) the "Waiting Time Penalties Class," which shall include all members of the Overtime Class whose employment terminated from December 10, 2010 through the date of preliminary approval of this settlement by the court ("Waiting Time Penalties Class Period"), and who have not previously signed a severance agreement and release.

> (c) An individual can be a member of both the Overtime Class and the Waiting Time Penalties Class.

Order 2.  As indicated by the proposed class definition, the Waiting Time Penalties Class is a subset of the Overtime Class.  In other words, every member of the Waiting Time Penalties Class is also a member of the Overtime Class; the converse is not true, however.  Of the 1,159 class members in the Overtime Class, 846 members of that class have waiting time penalty claims and are also members of the Waiting Time Penalties Class.  Righetti Suppl. Decl. [Final] ¶ 3, ECF No. 56.

B.       Reservations in the Preliminary Approval Order

As the court explained in its prior order, its review at the preliminary approval stage provided only a preliminary fairness evaluation.  Order 4–5.  The court framed its task at the time as follows:  "Preliminary approval of a settlement and notice to the proposed class is appropriate if 'the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential

3

treatment to class representatives or segments of the class, and falls with the range of possible approval.'" *Id.* at 5 (citations omitted).  Although the court preliminarily approved certification of the class and concluded that the proposed settlement was "within the range of possible approval," *id.* at 18, the court's preliminary approval included several reservations that must be addressed at the final approval stage here.

First, although the court noted that the Rule 23(a) requirement of "commonality" likely was satisfied and that the alleged policy of excluding bonus payments could "drive the resolution of the litigation," the court expressed uncertainty as to whether those common questions predominated over individual ones. *Id.* at 11–12 (citations omitted).  The court required additional briefing, and counsel clarified that "[t]he sole basis of [Pointer's] overtime claim (as well as his derivative claims) is his allegations that BANA improperly treated incentive compensation as 'discretionary' instead of 'non-discretionary,' and thereby did not include such amounts in the 'regular rate of pay' when calculating overtime payments."  Righetti Suppl. Decl. [Preliminary] 4, ECF No. 45.  In light of this clarification, the court was satisfied for purposes of the preliminary approval that BANA's policy applied equally to all putative class members. However, the court explained "these claims must, of course, be substantiated by evidence before the class is certified."  Order 12.

Second, the court noted a concern regarding the Rule 23(b)(3) requirement of "superiority." *Id.* at 12-15.  The court specifically pointed to questions regarding a pending class action in state court, *Pineda v. Bank of America, N.A.. Id.* at 12–15.  Class counsel clarified that the actions were unrelated, although there were many putative members of both classes, and agreed members of the *Pineda* class could participate in both settlements to the extent that membership in both classes would not allow for double recoveries. *Id.* at 14.  With this explanation, and having discussed the nature of this case with counsel at hearing, the court was "satisfied, for purposes of this motion, a class settlement is the superior form of litigation." *Id.*

Third, although the court preliminarily approved the use of *cy pres* for distribution of payments too small to warrant pro rata distribution, the court noted the absence of a court-approved charity to act as a recipient.  As the court wrote at the time, "[i]n principle this strategy

4

1    is acceptable, although more detail will be necessary before the court can approve the settlement

2    finally, including about the proposed *cy pres* charity."  Order 16 n.5.

3            Finally, the court indicated it lacked sufficient information to evaluate many

4    factors necessary to the final approval determination, including "the strength of [Pointer's] case";

5    "the risk, expense, complexity, and likely duration" of this litigation as compared to any class

6    action; "the risk of maintaining class action status throughout the trial"; "the amount offered in

7    settlement"; and "the reaction of the class members to the proposed settlement."  *Id.* at 20 (citing

8    *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

9            In addition to these reservations, the court also made two observations about issues

10   that it declined to address meaningfully in its preliminary approval order:

11           First, the court acknowledged counsel's intended request of a twenty-five

12   percentage-of-recovery award for attorneys' fees.  *Id.* at 19.  Although the court declined to

13   express any view on the probability that a twenty-five percent share would be awarded, especially

14   because defendants agreed not to oppose the fee award, the court wrote that a run-of-the mill

15   request of twenty-five percent "inclines the court to believe nothing suspect is afoot."  *Id.*

16           Second, the court similarly acknowledged the intended request of a $10,000

17   enhancement for the class representative.  *Id.* Without approving the enhancement, the court

18   noted that the request was "not astronomical."  *Id.*

19           With these reservations and observations in mind, the court proceeds to determine

20   whether to grant final approval of the settlement on a class basis.

21   II.      THE SETTLEMENT AGREEMENT

22           Pointer submitted the instant motion for final approval of the class settlement on

23   June 30, 2016.  Under the preliminarily approved settlement agreement, BANA would be

24   released from the claims alleged in the complaint, that is, those "based on the allegation that

25   Defendant failed to properly calculate and pay overtime compensation."  Mot. Final Approval 15.

26   The release would not apply to "claims or remedies for 'off the clock' work."  *Id.*  Under the

27   /////

28
                                                    5

1  agreement, BANA would owe nothing more to Pointer or the class members, but class members

2  may participate in any settlement in the *Pineda* case.  *Id.*

3          The agreed $1,750,000 payment will be BANA's total payment, which is defined

4  as the "Gross Settlement Amount."  *Id.* at 13.  Attorneys' fees ($437,500), attorneys' costs

5  ($15,000), an enhancement payment ($10,000), payments to the California Labor and Workforce

6  Development Agency ($15,000), and settlement administrator's fees and costs are deducted first.

7  *Id.*  The remainder, the "Net Settlement Amount," is available to pay settlement awards to class

8  members who submit a claim[1], and equals $1,253,500.  *Id.* at 14.  Using the Net Settlement

9  Amount, the Overtime Class will be paid the full value of the overtime miscalculation claim,

10  estimated at $300,000.  *Id.*  Each class member will be paid the amount he or she would have

11  received as overtime pay had BANA included APIP bonus payments in the regular pay rate.[2]  *Id.*;

12  Righetti Decl. [Final] ¶ 9, ECF No. 51-1.  Next, two-thirds of the remainder will be divided

13  equally among Waiting Time Penalties Class members who are also class members in the state

14  case of *Pineda v. Bank of America, N.A.*, that is, class members whose employment terminated

15  between October 22, 2004 and June 30, 2013 who did not otherwise release their claims against

16  BANA.  Mot. Final Approval 14; Musolino Suppl. Decl.  ¶ 3, ECF No. 55.  The remaining

17  amount will then be divided equally among the rest of the Waiting Time Penalties Class

18  members.  *Id.*  If any amount is still remaining, either because the amount to be distributed is too

19  small to warrant redistribution to the class or because a claimant failed to deposit a claim check,

20  the parties have asked the court to approve a *cy pres* beneficiary that would receive the remaining

21  amount.  *Cy Pres* Stip. 2, ECF No. 57.

22  _____

23  [1] Although class members must submit a claim to receive any share of the Net Settlement
    Amount, the Settlement Agreement releases claims as to all class members that do not opt out of

24  the class.  *See* Jnt. Stip. for Class Action Settlement ¶ 64, ECF No. 38-2.

25  [2] The settlement agreement specifies the calculation: (1) for each class member, divide the
    total APIP bonuses received during the class period by the number of his or her total hours

26  worked  during the class period; (2) reduce that amount by half; and (3) multiply that amount by
    the total number of overtime hours worked in the class period.  Righetti Decl. ¶ 9, ECF 51-1.

27  Using this method, the agreement spells out an example calculation: an employee who received a
    $1,000 bonus and worked 1,700 hours, including 10 overtime hours, would receive ($1,000 /

28  1,700) (0.5) (10) = $2.94.  *Id.*

1    Of the 1,159 class members in the Overtime Class, 846 members of that class have

2    waiting time penalty claims and are also members of the Waiting Time Penalties Class.  Righetti

3    Suppl. Decl. [Final] ¶ 3.  Among the 846 Waiting Time Penalties Class members, 525 of them are

4    *Pineda* class members.  *Id.* ¶ 4.

5    The court next addresses the legal standard required for final certification of the

6    class, followed by an application to the specific facts of this case.

7    III.    CLASS CERTIFICATION

8    A party seeking to certify a class must demonstrate the class meets the

9    requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of

10   Rule 23(b).  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  The court must

11   undertake the Rule 23 inquiry independently.  *West v. Circle K Stores*, No. 04–0438, 2006 WL

12   1652598, at *2 (E.D. Cal. June 12, 2006).

13   Under Rule 23(a), before certifying a class, the court must be satisfied that: (1) the

14   class is so numerous that joinder of all members is impracticable (the "numerosity" requirement);

15   (2) there are questions of law or fact common to the class (the "commonality" requirement);

16   (3) the claims or defenses of representative parties are typical of the claims or defenses of the

17   class (the "typicality" requirement); and (4) the representative parties will fairly and adequately

18   protect the interests of the class (the "adequacy of representation" inquiry).  *Collins v. Cargill*

19   *Meat Solutions Corp.*, 274 F.R.D. 294, 300 (E.D. Cal. 2011); Fed. R. Civ. P. 23(a).

20   Where, as here, plaintiff seeks certification under Rule 23(b)(3), the court must

21   find also that "'questions of law or fact common to class members predominate over any

22   questions affecting only individual members, and that a class action is superior to other available

23   methods for fairly and effectively adjudicating the controversy.'"  *Wal–Mart Stores, Inc. v. Dukes*

24   (*Dukes*), 564 U.S. 338, 362 (2011) (quoting Fed. R. Civ. P. 23(b)(3)).  The matters pertinent to

25   these findings include: (A) the class members' interests in individually controlling the

26   prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning

27   the controversy already begun by or against class members; (C) the desirability or undesirability

28   of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties

1    in managing the class action. Fed. R. Civ. P. 23(b)(3)(A)–(D); *see also Zinser v. Accufix*

2    *Research Inst., Inc.*, 253 F.3d 1180, 1190–92 (9th Cir. 2001).

3         Here, as defined above, Pointer seeks certification of the Overtime Class and the

4    Waiting Time Penalties Class, the latter of which is a subset of the former. In its prior order, the

5    court preliminarily certified the proposed class, finding initially it satisfied the numerosity,

6    commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23(a) and

7    23(b)(3), albeit with some reservations reviewed above. *See* Order 8–14. There has been no

8    objection to certification of the class, and nothing before the court suggests the preliminary

9    certification was improper. For purposes of final approval, the court determines whether the class

10    ultimately satisfies Rules 23, especially in light of its prior reservations. The court first examines

11    the four requirements of Rule 23(a) and then turns to the considerations relevant to certification

12    under Rule 23(b)(3).

13       A.     Numerosity

14         In its order granting preliminary approval, the court found the putative class met

15    the numerosity requirement because it included nearly 2,000 members. Order 9. For the

16    following reasons even though the number now is less by nearly half, the court finds the class to

17    meet this requirement for final approval.

18         Although there is no absolute numerical threshold for numerosity, courts have

19    approved classes of, for example, thirty-nine, sixty-four, and seventy-one plaintiffs. *Murillo v.*

20    *Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 474 (E.D. Cal. 2010) (citing *Jordan v. L.A. Cnty.*, 669

21    F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds*, 459 U.S. 810 (1982)). While class

22    counsel has clarified that the class includes only 1,159 members, Mot. Final Approval 14, that

23    number still easily surpasses the number of members approved in past cases. *See id*. Thus, the

24    class still remains large enough to satisfy the numerosity requirement.

25       B.     Commonality

26         In preliminarily approving the class, the court found the class met the commonality

27    requirement because there were questions and issues common to the class. Order 9–10. As

28    discussed below, the court finds the class to meet this requirement for final approval.

1     To satisfy the commonality requirement, plaintiff must do more than show class

2   members "have all suffered a violation of the same provision of law." *Dukes*, 564 U.S. at 350.

3   Class claims must depend upon a common contention that "must be of such a nature that it is

4   capable of classwide resolution—which means that determination of its truth or falsity will

5   resolve an issue that is central to the validity of each one of those claims in one stroke." *Id.*  It is

6   not so much that the class raises common questions; what is necessary is "the capacity of a

7   classwide proceeding to generate common answers . . . ." *Id.*  "[T]he merits of the class

8   members' substantive claims are often highly relevant when determining whether to certify a

9   class." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011).

10     As the court noted in its preliminary approval, a central question in this litigation is

11   whether BANA's method of computing the overtime rate of pay for Home Service Specialists

12   violates state law.  Order 11–12.  Pointer alleges BANA did not correctly calculate his regular

13   rate of pay because it did not include any of the bonus payments he received under the APIP.  *See*

14   FAC ¶ 15.  This alleged omission is significant because the minimum wage a California employer

15   must pay for overtime work is calculated as a multiple of each employee's regular rate of pay.

16   *See* Cal. Lab. Code § 510(a).  Section 510(a) provides, in relevant part:

> Eight hours of labor constitutes a day's work. Any work in excess
> of eight hours in one workday and any work in excess of 40 hours
> in any one workweek and the first eight hours worked on the
> seventh day of work in any one workweek shall be compensated at
> the rate of no less than one and one-half times the regular rate of
> pay for an employee. Any work in excess of 12 hours in one day
> shall be compensated at the rate of no less than twice the regular
> rate of pay for an employee. In addition, any work in excess of
> eight hours on any seventh day of a workweek shall be
> compensated at the rate of no less than twice the regular rate of pay
> of an employee.

24   *Id.*  Whether BANA had a common, class-wide policy to calculate overtime pay rates is one

25   common question, and whether that method complied with California law is another.  Answering

26   these common questions in Pointer's favor would not conclusively demonstrate BANA's liability.

27   Neither would common affirmative answers fix the amount of a potential damages award.  The

28   amount of overtime pay improperly withheld would depend on the number of hours an employee

1  worked, when they were worked, and on what day.  *See id.* § 510(a).  Nevertheless, a policy of

2  excluding bonus payments, if proven to exist, may "drive the resolution of the litigation," *Dukes*,

3  564 U.S. at 350, despite other individualized questions.  *See Leyva*, 716 F.3d at 514 ("[T]he

4  presence of individualized damages cannot, by itself, defeat class certification under Rule

5  23(b)(3)."); *Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012)

6  (class may be certified even though some questions of law or fact are not common to the class);

7  *see also Ching v. Siemens Indus., Inc.*, No. 11–4838, 2013 WL 6200190, at *4 (N.D. Cal. Nov.

8  27, 2013) (finding commonality requirement satisfied where "the issues facing the class ar[o]se

9  from common questions involving [the] [d]efendant's calculation and payment of wages and

10 overtime"); *Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625, 633 (S.D. Cal. 2010) (finding

11 commonality requirement satisfied where plaintiffs identified "common factual questions, such as

12 whether [the] [d]efendants' policies deprived the . . . class members of meal periods, rest periods,

13 overtime pay, and reimbursement . . . and common legal questions, such as [the] [d]efendants'

14 obligations under [various sections of the] California Labor Code and California's Unfair

15 Competition law").  The class in this case satisfies the commonality requirement.

16        C.    Typicality

17              In the preliminary order, the court found Pointer to satisfy the typicality

18 requirement because his claims are typical of both the subclasses.  Order 11.  As explained below,

19 the court finds the class to meet this requirement for final approval as well.

20              "'[T]he commonality and typicality requirements of Rule 23(a) tend to merge'"

21 because both act "'as guideposts for determining whether maintenance of a class action is

22 economical and whether the named plaintiff's claim and the class claims are so interrelated that

23 the interests of the class members will be fairly and adequately protected in their absence.'"

24 *Dukes*, 564 U.S. at 350 n.5 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–58 & n.13

25 (1982)).  A court resolves the typicality inquiry by considering "whether other members have the

26 same or similar injury, whether the action is based on conduct which is not unique to the named

27 plaintiffs, and whether other class members have been injured by the same course of conduct."

28 *Ellis*, 657 F.3d at 984.

10

1             Here, as class counsel confirms, Pointer is a member of both the Overtime Class

2 and the Waiting Time Class.  Righetti Suppl. Decl. [Final] ¶ 5.  Pointer and each class member

3 allegedly were employed in the same position at the same time, and he and each class member

4 allegedly were subjected to the same policy of underpayment.  Pointer has claims similar to the

5 class to unpaid overtime wages and to a fraction of the statutory waiting time penalties, and he

6 will accordingly receive payment under the settlement agreement as a member of each subclass.

7 As such, Pointer satisfies the typicality requirement.

8            D.     Adequacy of Representation

9             In the preliminary order, the court found Pointer adequately represented the

10 interests of the class.  Order 9. As explained below, the court finds he adequately represents the

11 class interests  for final approval as well.

12             To determine whether the named plaintiff will protect the interests of the class, the

13 court must explore two factors: (1) whether the named plaintiffs and counsel have any conflicts of

14 interest with the class as a whole, and (2) whether the named plaintiffs and counsel vigorously

15 pursued the action on behalf of the class.  *Hanlon*, 150 F.3d at 1020; *see also Clersceri v. Beach*

16 *City Investigation Servs., Inc.*, No. 10–3873, 2011 WL 320998, at *6 (C.D. Cal. Jan. 27, 2011).

17             With respect to the first factor, nothing in the record before the court suggests

18 Pointer as representative or class counsel have any conflicts of interest with the other class

19 members.  *See generally* Righetti Decl. [Final]; Righetti Decl. [Fees] 50–53, Ex. 7 (Pointer

20 Decl.), ECF No. 50-1.  As discussed above, Pointer's injuries, claims, and interests are typical of

21 both subclasses.  In other words, Pointer's claims appear to be "completely aligned with [those]

22 of the class."  *Collins*, 274 F.R.D. at 301.  Moreover, the court finds nothing to support a conflict

23 between class counsel and other class members.  As discussed below, class counsel are

24 experienced employment litigators who have successfully represented numerous, similar classes

25 of employees.  Thus, the court finds no conflict and the first factor is satisfied.

26             With respect to the second factor, "[a]lthough there are no fixed standards by

27 which 'vigor' can be assayed, considerations include competency of counsel and, in the context

28 of a settlement-only class, an assessment of the rationale for not pursuing further litigation."

1    *Hanlon*, 150 F.3d at 1021.  Here, lead class counsel has described his experience in class-action

2    cases and, specifically in class-action cases involving employment-related matters.  *See* Righetti

3    Decl. [Final] ¶¶ 7–10.  Class counsel also describes the effort expended in the action thus far,

4    which includes conducting an investigation, conducting interviews of putative class members,

5    propounding and producing multiple sets of discovery, taking several depositions, and engaging

6    in litigation during the discovery process.  *See id.*  ¶ 29.  Additionally, Pointer participated in the

7    litigation process by contacting witnesses and gathering information about the case.  *See id.* ¶ 41;

8    *see generally* Pointer Decl..  Moreover, class counsel points to several risks of pursuing further

9    litigation, including an ongoing threat to class certification and also increasing costs that could

10   quickly exceed the value of the proposed settlement and BANA's exposure.  *See* Mot. Final

11   Approval 22; *see also In re Mego Fin. Corp. Securities Litig.*, 213 F.3d 454, 463 (9th Cir. 2000),

12   *as amended* (June 19, 2000) (finding complex litigation risks as relevant to "vigor"

13   determination).  This evidence adequately demonstrates class counsel's and Pointer's vigorous

14   advocacy on behalf of absent class members.  As such, class counsel and Pointer have satisfied

15   the adequacy of representation requirement.

16          In sum, because the court finds no apparent conflict within the class, and because

17   the court finds the class representative and class counsel vigorously pursued the action on behalf

18   of the class, the court concludes the class counsel and representative adequately represented the

19   class.

20          E.      Predominance

21          In the preliminary approval order, the court concluded the class met the

22   predominance requirement.  In reaching that preliminary conclusion, the court relied on Pointer's

23   unsupported assertion that "[t]he sole basis of [Pointer's] overtime claim (as well as his derivative

24   claims) is his allegations that BANA improperly treated incentive compensation as 'discretionary'

25   instead of 'non-discretionary,' and thereby did not include such amounts in the 'regular rate of

26   pay' when calculating overtime payments."  Order 12.  As the court wrote in its preliminary

27   approval, "[t]hese claims must, of course, be substantiated by evidence before the class is [finally]

28   certified."  *Id.*

12

1    "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are

2    sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.

3    Although predominance is similar to Rule 23(a)'s commonality requirement, it is more

4    demanding. *Id.* at 624.  To determine whether common questions predominate, the court must

5    consider "the relationship between the common and individual issues" by looking at the questions

6    that pre-exist any settlement. *Hanlon*, 150 F.3d at 1022.  Additionally, the predominance inquiry

7    focuses on the "notion that adjudication of common issues will help achieve judicial economy."

8    *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009).

9        Here, plaintiff's claims all hinge on the uniform policies and practices of BANA—

10   namely, whether the APIP was properly classified as a discretionary bonus to be included in the

11   regular rate of pay—rather than the individual treatment of class members. *See* Mot. Final

12   Approval 14; Righetti Decl. [Final] ¶ 26.  Although the amount of overtime hours and the bonus

13   payments may vary by class member, these individual differences are damages questions, and

14   "'[t]he amount of damages is invariably an individual question and does not defeat class action

15   treatment.'" *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) (citing

16   *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975)); *Leyva v. Medline Indus., Inc.*, 716 F.3d

17   510, 514 (9th Cir.2013) ("[T]he presence of individualized damages cannot, by itself, defeat class

18   certification under Rule 23(b)(3)").  As a result, the issues stemming from defendants' alleged

19   conduct, as explained by class counsel's motion and declarations, satisfy the predominance

20   requirement.

21       F.    Superiority

22       In the preliminary approval order, the court found plaintiff satisfied the superiority

23   requirement.  Order 12–14.  However, the court noted the potential difficulties the then-pending

24   *Pineda* state class action presented, especially because the proposed settlement in this case

25   allocates payments to the Waiting Time Penalties Class according to their membership in *Pineda*.

26   The court granted preliminary approval, in part, because the parties agreed members of the

27   *Pineda* class could participate in both the *Pineda* settlement and this settlement to the extent

28   membership in both classes would not allow for double recoveries.  Order 14.

13

1    In resolving Rule 23(b)(3)'s superiority inquiry, the court should consider class

2    members' interests in pursuing separate actions individually and any litigation already in progress

3    involving the same controversy.  *See Schiller v. David's Bridal, Inc.*, No. 10–0616, 2012 WL

4    2117001, at *10 (E.D. Cal. June 11, 2012) (explaining why the remaining two factors pertaining

5    to the forum and difficulties in managing the class action are irrelevant in the settlement context)

6    (citing *Amchem*, 521 U.S. at 620)).

7    Here, there is no apparent interest in individual control of the litigation.

8    Claims under the settlement agreement range from $0.59 to $2,882.17, Righetti Suppl. Decl.

9    [Final] 10–12, Ex. 1 (Pikus Suppl. Decl.), ¶ 4, and it is unlikely that an individual claimant would

10   choose to pursue individual litigation.  As evidence of this proposition, class counsel point to the

11   complete lack of objections and opt-outs.  Mot. Final Approval 8.  In addition, there exist clear

12   advantages in proceeding on a class basis, as many of the smaller claims would not warrant

13   individual litigation.  Finally, the parties' settlement agreement adequately addresses the

14   overlapping nature of this suit with the action in *Pineda*, as the parties agreed to permit class

15   members to participate in both the settlements to the extent they are properly members of both

16   classes.  *See* Righetti Suppl. Decl..  BANA's most recent supplemental declaration, which

17   explains the *Pineda* class has been finally approved and "fully paid out," further supports the

18   conclusion that *Pineda* does not threaten the superiority of the action here.  Musolino Suppl.

19   Decl. ¶¶ 4–6.  In sum, the class action here is a superior means of litigating plaintiff's claims.

20   G.    Conclusion

21   The court finds plaintiff satisfies Rules 23(a) and 23(b).  Final approval of the

22   class, as defined above, is appropriate.  The court next considers whether notice to the class

23   satisfies the requirements of Rule 23(e).

24   IV.   NOTICE TO AND RESPONSE FROM CLASS MEMBERS

25   In its preliminary approval order, the court reviewed the proposed notice and

26   found that it conforms with due process and Rule 23(c)(2)(B).  Order 21–22.  The court also

27   found that the proposed notice adequately described the terms of the settlement, informed the

28   class about the allocation of attorneys' fees, and, once completed, would provide specific and

14

1   sufficient information regarding the date, time, and place of the final approval hearing.  *Id.*  The

2   court found that the proposed notice would adequately inform recipients how they may object or

3   opt out of the proposed settlement and that the proposed mode of delivery, by mail, appeared

4   appropriate in these circumstances.  *Id.* at 22.

5           In its prior order, the court appointed Rust Consulting ("Rust") as claims

6   administrator.  Order 22.  As contemplated by the court's initial order, Rust would be responsible

7   for distributing the class notice, calculating individual settlement payments, and preparing and

8   issuing all disbursements to be paid to class members.  *See* Order 17; *see generally* Pikus Decl.,

9   ECF 51-2.  According to Rust Senior Project Manager Chris Pikus, Rust received data from

10  BANA for 1,159 potential class members in March 2016.  Pikus Decl. ¶ 9.  The data contained

11  names, last known addresses, social security numbers, regular and overtime hours worked, APIP

12  payments received and dates of employment.  The mailing addresses the list contained were

13  processed and updated using the National Change of Address Database ("NCOA") maintained by

14  the U.S. Postal Service, which contains requested changes of address filed with the Postal

15  Service. *Id.* ¶ 10.  Prior to contacting class members, Rust set up a telephone number, facsimile

16  number, and an email for inclusion in the notice for class members as points of contact for

17  questions and sending of claim forms, objections, or opt-outs.  *Id.* ¶¶ 5–7.

18          On March 31, 2016, Rust mailed notice packets to all class members by first class

19  mail.  *Id.* ¶ 11.  Pikus reports that, as of his declaration on June 30, 2016, forty-six notice packets

20  were returned as undeliverable.  *Id.* ¶ 12.  Rust obtained thirty-nine updated addresses and re-

21  mailed class notices to those class members by first class mail.  *Id.*  Four of these were returned

22  undeliverable, for a total of eleven notices that were undeliverable.  *Id.*  Thirteen notices were

23  returned with forwarding addresses and re-mailed to the forwarded addresses.  *Id.* ¶ 13.

24          By October 14, 2016, the date of Pikus' supplemental declaration, Rust had

25  received 689 claim forms out of 1,159 putative class members.  Pikus Suppl. Decl. ¶ 4.  Class

26  counsel accepted as timely twenty-four forms received after the May 16, 2016 deadline, but did

27  not accept one form that was missing a signature.  *Id.*  As a result, Rust considers 688 claim forms

28  to be valid and timely.  *Id.* Twelve of the claim forms disputed the amounts reported in the claim

15

1    forms, and Rust investigated and determined that all of the initial amounts calculated were correct

2    and supported by the BANA's business records.  *Id.*  As of October 14, 2016, none of the twelve

3    class member who had disputed the amounts objected to the denials of their claims.  *Id.*  On or

4    about May 26, 2016, Rust discovered an error that overstated the claim value reported to 151

5    class members.  Pikus Decl. ¶ 16.  Rust notified those claimants of the error and allowed time to

6    object or opt-out based on the updated information.  At the final approval hearing held on

7    October 7, 2016, the parties confirmed they had received no additional opt-outs or objections.

8            Based on the extensive efforts to notify the class members outlined above, the

9    court concludes that notice was directed in a reasonable manner to all class members who would

10   be bound by the proposal and satisfied the requirements of Rule 23(e).  Next, the court reviews

11   the legal standard for determining if a settlement agreement is fair, reasonable, and adequate

12   under Rule 23, and then the court applies that standard to the settlement agreement in this case.

13   V.      SETTLEMENT AND FAIRNESS

14           A.      Legal Standard

15           When parties settle a class action, a court cannot simply accept the proposed

16   resolution; rather it must also satisfy itself that the proposed settlement is "fundamentally fair,

17   adequate, and reasonable."  *Hanlon,* 150 F.3d at 1026.  After preliminary certification and notice

18   to the class, a court conducts a fairness hearing before finally approving any proposed settlement.

19   *Narouz v. Charter Commc'ns, Inc.,* 591 F.3d 1261, 1267 (9th Cir. 2010); Fed. R. Civ. P. 23(e)(2)

20   ("If the proposal would bind class members, the court may approve it only after a hearing and on

21   finding that it is fair, reasonable, and adequate.").  A court must balance a number of factors in

22   determining whether a proposed settlement is in fact fair, adequate and reasonable:

23           (1) the strength of the plaintiffs' case; (2) the risk, expense,
             complexity, and likely duration of further litigation; (3) the risk of
24           maintaining class action status throughout the trial; (4) the amount
             offered in settlement; (5) the extent of discovery completed and the
25           stage of the proceedings; (6) the experience and views of counsel;
             (7) the presence of a governmental participant; and (8) the reaction
26           of the class members to the proposed settlement.

27   *Hanlon*, 150 F.3d at 1026; *Adoma v. Univ. of Phx.*, 913 F. Supp. 2d 964, 974–75 (E.D. Cal.

28   2012).  The list of factors is not exhaustive, and "[t]he relative degree of importance to be

                                                      16

attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982). For example, where the parties negotiate a settlement agreement before a formal class certification, the court must evaluate the settlement for evidence of collusion with a "higher level of scrutiny." *In re Bluetooth Headset Products Liab. Litig.* ("*Bluetooth*"), 654 F.3d 935, 946 (9th Cir. 2011).

When determining the fairness of a settlement agreement, the court must consider the settlement as a whole, rather than its component parts; the core settlement "must stand or fall in its entirety." *Hanlon*, 150 F.3d at 1026; *but see In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1190 n.5 (9th Cir. 2013) (in concluding the proper amount of attorneys' fees, the agreement as a whole need not stand or fall on the amount). Ultimately, the court must reach "a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625.

B.    Discussion

The court now considers each *Hanlon* factor in turn and then reviews the settlement agreement for evidence of collusion under *Bluetooth*.

1.    The Strength of Plaintiff's Case

The first *Hanlon* factor concerns the strength of the plaintiff's case. The court does not reach "any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of [the] litigation." *In re Wash. Pub. Power Supply Sys. Secs. Litig.*, 720 F. Supp. 1379, 1388 (D. Ariz. 1989). The court in fact cannot reach such a conclusion because evidence has not been fully presented and typically "settlements [are] induced in large part by the very uncertainty as to what the outcome would be, had litigation continued." *Id.* Instead, the court is to "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Id.*

1           As the court's preliminary approval order indicates, plaintiff presents a viable

2    claim for class treatment based on the relevant uniform policies and practices of BANA.  If

3    successful, BANA could be subject to both compensatory damages and penalties under California

4    Private Attorneys General Act (PAGA).  On the other hand, defendant, a well-funded corporate

5    adversary, has repeatedly denied the viability of plaintiff's claims and challenged the suitability

6    of his case for class treatment.  In addition, BANA has raised several affirmative defenses that, if

7    the litigation were to proceed, could threaten plaintiff's ability to proceed on a class-wide basis.

8    In light of these considerations, class counsel were reasonable in seeking settlement as early as

9    they did.  Thus, this factor favors approving the settlement.

10          2.     The Risk, Expense, Complexity and Likely Duration of Further Litigation
                The Risk of Maintaining Class Action Status Throughout Trial

11

12          The court considers the second and third *Hanlon* factors together, which both

13   concern the judicial preference for approving a settlement rather than embarking on lengthy,

14   expensive, and complex litigation.  *Morales v. Stevco, Inc.*, No. 1:09-CV-00704 AWI, 2011 WL

15   5511767, at *10 (E.D. Cal. Nov. 10, 2011) ("Approval of settlement is 'preferable to lengthy and

16   expensive litigation with uncertain results.'") (citation omitted).  The Ninth Circuit has explained

17   "there is a strong judicial policy that favors settlements, particularly where complex class action

18   litigation is concerned."  *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008) (citing

19   *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)).  "'[I]t must not be

20   overlooked that voluntary conciliation and settlement are the preferred means of dispute

21   resolution.  This is especially true in complex class action litigation . . . .'"  *Id.* (quoting *Officers*

22   *for Justice*, 688 F.2d at 625).

23          Here the parties have reached a reasonable voluntary agreement that will provide

24   class members with immediate substantial relief while avoiding delays in continued litigation,

25   which could be prolonged and expensive.  Trial could incur costs that exceed both the value of

26   the proposed settlement to the class as well as BANA's exposure.  *See* Mot. Final Approval 22.

27   Although the case does not present particularly complex issues, the amount offered in settlement

28

18

1    is such that obtaining a more favorable result at trial, which may be lengthy, is not at all clear.

2    Therefore, this factor favors approval of the settlement.

3                    3.      The Amount Offered in Settlement

4            The next *Hanlon* factor concerns the fairness of the amount offered in settlement.

5    The fairness of the proposed settlement is not to be judged against "a hypothetical or speculative

6    measure of what might have been achieved by the negotiators." *Officers for Justice*, 688 F.2d at

7    625; *see also Collins*, 274 F.R.D. at 302 (a court must "'consider plaintiffs' expected recovery

8    balanced against the value of the settlement offer'" (quoting *In re Tableware Antitrust Litig*.,

9    484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007)).

10           Here, the Net Settlement Amount to be paid to the 688 class members who

11   submitted claim forms is $1,253,500, which is substantially more than class members lost as a

12   result of BANA's overtime miscalculation.  The parties estimate that, according to BANA's

13   records, the full value of the overtime miscalculation is approximately $300,000.  Mot. Final

14   Approval 4, 14.  The balance of the net settlement is allocated to the waiting time penalty claims,

15   which are valued depending on whether a class member is a member of the *Pineda* waiting time

16   class, had the opportunity to claim waiting time penalties in the *Pineda* class action settlement

17   and is subject to the *Pineda* classwide release/judgment.  *Id.* at 14.  The class administrator

18   estimates that individual settlement awards for the 688 class members that submitted valid and

19   timely claims is approximately $1,000.  *Id.* at 19.  The individual recoveries vary, but all class

20   members are receiving more than their out-of-pocket losses.  *Id.*

21           Moreover, distribution is designed to ensure fairness among class members: after

22   paying out the claims to the Overtime Class, two thirds of the remaining Net Settlement Fund will

23   be paid to Waiting Time Penalties Class members who are also class members in *Pineda*, and one

24   third of the Net Settlement Fund will be paid to Waiting Time Penalties Class members who are

25   not class members in *Pineda*.  Of the 1,159 class members in the Overtime Class, approximately

26   846 members of that Class have waiting time penalty claims, i.e., their employment with BANA

27   ended during the relevant time period and plaintiff alleges BANA did not pay them all of the

28   overtime wages owed to them at the time of their termination.  Righetti Suppl. Decl. [Final] ¶ 3,

19

1    ECF No. 56.  Of these 846 people, 525 of them, approximately two thirds, are also class members

2    in *Pineda*.  Mot. Final Approval 19; Righetti Suppl. Decl. [Final] ¶ 3.  Thus, the distribution to

3    Waiting Time Penalties Class members roughly corresponds to the members' participation in

4    *Pineda*; about two thirds of Waiting Time Penalties Class members are also *Pineda* class

5    members, and those class members will receive two thirds of the remaining Net Settlement Fund;

6    conversely, about one third of Waiting Time Penalties Class members are non-*Pineda* class

7    members, and those class members will receive one third of the remaining Net Settlement Fund.

8            Because all class members stand to receive their out-of-pocket losses, and because

9    the remaining statutory penalties are distributed proportionally among the *Pineda* and non-*Pineda*

10   class members, this factor weighs in favor of approving the settlement.

11               4.        The Extent of Discovery and the Stage of the Proceedings

12           The next *Hanlon* factor concerns whether the parties had adequate information to

13   engage in informed negotiations before reaching settlement.  "In the context of class action

14   settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties

15   have sufficient information to make an informed decision about settlement."  *Linney v. Cellular*

16   *Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) (quoting *In re Chicken Antitrust Litig.,* 669

17   F.2d 228, 241 (5th Cir. 1982)).

18           Class counsel represent that the parties engaged in "extensive" informal

19   information exchange and formal discovery to enable both sides to assess potential claims and

20   defenses.  Mot. Att'ys' Fees 13.  The party's formal discovery included special interrogatories,

21   requests for production of documents, requests for admissions, depositions, and third party

22   subpoenas for documents and electronic records.  Righetti Decl. [Final] ¶ 6.  Plaintiff also

23   deposed several BANA employees and interviewed several putative class members about their

24   potential claims.  *Id.*  The parties additionally litigated discovery issues, and plaintiff successfully

25   moved to compel additional discovery.  Order Nov. 20, 2014, ECF No. 22.  As a result, the court

26   is persuaded that counsel took sufficient steps to ensure it could make an informed decision about

27   settlement.  This factor weighs in favor of approving the settlement.

28   /////

1          5.       The Experience and Views of Counsel

2                   In considering the adequacy of the terms of a settlement, the trial court is entitled

3    to, and should, rely upon the judgment of experienced counsel for the parties.  *Natl. Rural*

4    *Telecomm. Coop. v. DIRECTV, Inc.* (*DIRECTV*), 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("Great

5    weight is accorded to the recommendation of counsel, who are most closely acquainted with the

6    facts of the underlying litigation") (internal quotation marks and citations omitted).  This reliance

7    is predicated on the fact that "[p]arties represented by competent counsel are better positioned

8    than courts to produce a settlement that fairly reflects each party's expected outcome in the

9    litigation."  *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995); *see also Barbosa v.*

10   *Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013).

11                  Here, class counsel are experienced practitioners who have successfully litigated

12   many similar cases.  Matthew Righetti has been practicing in the area of complex class action

13   litigation since 1985, and Michael Righetti has been practicing law since 2008.  Righetti Decl.

14   [Preliminary] ¶¶ 2–3, ECF No. 38-2; Righetti Decl. [Fees] ¶ 27.  Class counsel's firm, Righetti

15   Glugoski, P.C., handles class actions exclusively and has litigated many wage and hour class

16   actions.  Mot. Prelim. Approval 6.  Class counsel cite several of their prior cases—all overtime

17   exemption cases—that various courts approved.  Righetti Decl. [Fees] ¶¶ 7–11.  Based on their

18   experience, class counsel believe the settlement is an "excellent" result for class members.  Mot.

19   Att'ys' Fees 10.  Given the experience of counsel and their opinion on the fairness of this

20   settlement agreement, this factor favors approving the settlement.

21          6.       The Presence of a Governmental Participant

22                  This factor does not apply because no government entity participated in the case.

23   *In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act* (*FACTA*) *Litig.*, 295

24   F.R.D. 438, 455 (C.D. Cal. 2014).

25          7.       The Reaction of Class Members to the Proposed Settlement

26                  *Hanlon* further directs the court to examine any objections or opt-outs from class

27   members.  "The absence of a large number of objections to a proposed class action settlement

28   raises a strong presumption that the terms of a proposed class settlement action are favorable to

1    the class members." *DIRECTV*, 221 F.R.D. at 529.  Where there are no objections, the

2    presumption is particularly strong.  *Lo v. Oxnard European Motors*, LLC, No. 11–1009, 2012

3    WL 1932283, at *2 (S.D. Cal. May 29, 2012) (noting "the fairness of the terms of the settlement

4    is bolstered by the fact that no objections were made").

5            Here, at the final approval hearing, class counsel confirmed that no opt-out forms

6    or objections to the proposed settlement were filed or served on counsel.  As such, this factor

7    weighs in favor of approving the settlement.

8                        8.    The Possibility of Collusion

9            Where the parties negotiate a settlement agreement before a formal class

10   certification, the court must evaluate the settlement for evidence of collusion with a "higher level

11   of scrutiny."  *Bluetooth*, 654 F.3d at 946.  "Collusion may not always be evident on the face of a

12   settlement, and courts therefore must be particularly vigilant not only for explicit collusion, but

13   also for more subtle signs that class counsel have allowed pursuit of their own self-interests and

14   that of certain class members to infect the negotiations."  *Id.* at 947.  A few such signs may

15   include: (1) a disproportionate distribution of the settlement to counsel; (2) a "clear-sailing"

16   provision, under which the defendant agrees not to oppose an attorney's fee award up to a certain

17   amount, *id.*; and (3) when the parties arrange for fees not awarded to revert to defendants rather

18   than to be added to the class fund., *id.*

19           Here, the court notes the party's extensive formal and informal discovery as well

20   as the day-long mediation as substantial evidence of the lack of collusion.  An experienced third

21   party mediator, Mark Rudy, facilitated a day-long mediation between the parties.  Righetti Decl.

22   [Fees] ¶ 30.  The parties failed to reach a settlement at first, but continued to engage in further

23   negotiation with Rudy's support.  *Id.*

24           Turning to the first *Bluetooth* sign, class counsel seek $437,500, or twenty-five

25   percent of the Gross Settlement Amount.  Mot. Final Approval 6.  The proposed distribution of

26   the settlement to counsel is not disproportionate, and is within a percentage range the Ninth

27   Circuit deems acceptable.  *Hanlon*, 150 F.3d at 1029 (citing *Six (6) Mexican Workers v. Arizona*

28   *Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir.1990)).  Thus, the first *Bluetooth* sign weighs in

1    favor of finding no collusion.  As to the second sign, the court previously declined to express any

2    view of the fee where the defendant has agreed not to oppose the fee award.  Order 19.  Although

3    defendant agreed not to oppose class counsel's request for attorney's fees, those fees will come

4    from the settlement fund, so defendants' agreement does not raise a substantial concern here.  *Cf.*

5    *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 961 n.5 (9th Cir. 2009) (collusion generally inferred

6    from a "clear-sailing" provision where attorney's fees are paid on top of the settlement fund).

7    Thus, the second sign weighs in favor of finding no collusion.  As to the third sign, the defendant

8    does not receive any fees not awarded .  The settlement agreement provides that all funds are

9    either distributed to class members on a pro rata basis or, if the amount is too small to warrant pro

10   rata distribution or if checks are not cashed, they will be distributed to a *cy pres* beneficiary.  On

11   the current record, the court does not find evidence of collusion.  The lack of such evidence

12   weighs in favor of approving the settlement.

13          In sum, the court finds the settlement agreement is "fair, reasonable, and adequate"

14   and consequently satisfies the fairness requirements of Rule 23(e).

15   VI.    FEES, COSTS, INCENTIVES, AND *CY PRES*

16          In the following sections, the court addresses whether to grant class counsel's

17   requests for attorneys' fees, costs, an incentive award, administrator's costs, and a *cy pres*

18   beneficiary.

19          A.     Attorneys' Fees

20          Rule 23 permits a court to award "reasonable attorney's fees  . . . that are

21   authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  Even when the parties

22   have agreed on an amount, the court must award only reasonable attorneys' fees.  *Bluetooth*,

23   654 F.3d at 941.  "Where a settlement produces a common fund for the benefit of the entire class,

24   courts have discretion to employ either the lodestar method or the percentage-of-recovery

25   method."  *Id.* at 942.  Courts should employ the lodestar method where, for example, awarding

26   twenty-five percent of a "megafund" would yield windfall profits for class counsel in light of the

27   hours spent on the case.  *Id.*  But here, where the "benefit to the class is easily quantified" in a

28   common-fund settlement, the court can employ the percentage-of-recovery method.  *Id.*  The

23

1    Ninth Circuit has held that the court may, but is not required to, compare the lodestar and the

2    percentage benchmark to determine if requested attorneys' fees are inappropriately high or low.

3    *Fischel v. Equitable Life Assurance Society of the United States*, 307 F.3d  997, 1007 (9th Cir.

4    2002) (finding no error where district court awarded fees under lodestar method and failed to

5    compare lodestar with twenty-five percent benchmark).  Overall, the goal is to produce a

6    reasonable result.  *Bluetooth*, 654 F.3d at 942.

7           Next, the court considers the reasonableness of class counsel's request for

8    $437,500 in attorneys' fees using the percentage-of-recovery method and then conducting a cross-

9    check using the lodestar method.

10                  1.      Percentage of Fee Recovery

11          In the Ninth Circuit, the twenty-five percent benchmark for percentage-of-

12   recovery awards may be adjusted up or down.  *Hanlon*, 150 F.3d at 1029; *Ross v. U.S. Nat'l Bank

13   Ass'n*, No. 07–02951, 2010 WL 3833922, at *2 (N.D. Cal. Sept  29, 2010).  Factors that may

14   justify departure from the benchmark include: (1) the result obtained; (2) the risk involved in the

15   litigation; (3) the contingent nature of the fee; (4) counsel's efforts, experience, and skill; and

16   (5) awards made in similar cases.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048–50 (9th Cir.

17   2002). "The twenty-five percent benchmark rate, although a starting point for analysis, may be

18   inappropriate in some cases.  Selection of the benchmark or any other rate must be supported by

19   findings that take into account all of the circumstances of the case." *Id.* at 1048. "[T]he exact

20   percentage varies depending on the facts of the case," and one colleague has concluded that "in

21   most common fund cases, the award exceeds that benchmark." *Vasquez v. Coast Valley Roofing,

22   Inc.*, 266 F.R.D. 482, 491 (E.D. Cal. 2010); *Williams v. Centerplate, Inc.*, No. 11–2159, 2013 WL

23   4525428, at *7 (S.D. Cal. Aug. 26, 2013) (concluding an award of attorneys' fees in the amount

24   of thirty percent of the common fund or $195,000 was reasonable); *In re Activision Sec. Litig.*,723

25   F. Supp. 1373, 1377 (N.D. Cal. 1989) (noting "nearly all common fund awards range around

26   30%").

27          Here, as noted, class counsel request an attorneys' fee award of twenty-five

28   percent or $437,500, the benchmark proportion.  Mot. Final Approval 6.  The court finds the fee

1   request reasonable because counsel obtained an early settlement and favorable result per class

2   member, while avoiding increased costs and the uncertainties of litigation.  *See Vasquez*,

3   266 F.R.D. at 492 (result favorable where 56 employees were to receive a recovery of $2,600 per

4   employee); *see also Ching v. Siemens Indus., Inc.*, 11-CV-04838-MEJ, 2014 WL 2926210, at *2

5   (N.D. Cal. June 27, 2014) (noting "the overall result and benefit to the class from the litigation is

6   the most critical factor in granting a fee award").  Additionally, class counsel handled the case on

7   a contingent fee basis, Mot. Att'ys' Fees 11–12, ECF No. 50, and courts have long recognized the

8   public policy of rewarding attorneys for accepting contingent representation in appropriate cases.

9   *See In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994) ("It is an

10  established practice in the private legal market to reward attorneys for taking the risk of

11  nonpayment by paying them a premium over their normal hourly rates for winning contingency

12  cases.").  The experience of class counsel also supports a twenty-five percent award.  The two

13  attorneys who represent the class, Matthew and Michael Righetti, have together nearly forty years

14  of experience, largely devoted to class action employment cases, and they have successfully

15  litigated a number of similar cases.  *See* Righetti Decl. [Preliminary] 2–4.  Finally, class counsel's

16  skill in representing the class here further supports a twenty-five percent award.  Class counsel

17  did not shrink from litigating a discovery dispute and prevailed in their discovery motion.  *See*

18  Mot. Compel, ECF No. 16.   Moreover, class counsel reached settlement through private

19  mediation prior to any motion brought by defendants.  In light of these considerations, class

20  counsel have adequately supported their request for twenty-five percent recovery.

21                           2.      Lodestar Cross-Check

22           The Ninth Circuit encourages courts to guard against an unreasonable fee by cross-

23  checking their calculations against a second method.  *Bluetooth*, 654 F.3d at 944.  In particular,

24  the lodestar method can "'confirm that a percentage of recovery amount does not award counsel

25  an exorbitant hourly rate.'"  *Id.* at 945 (internal citations omitted).  To calculate the lodestar figure,

26  a court multiplies "the number of hours the prevailing party reasonably expended on the litigation

27  (as supported by adequate documentation) by a reasonable hourly rate for the region and for the

28  experience of the lawyer."  *Id.* at 941 (citing *Staton v. Boeing Co.*, 327 F.3d 938, 965 (9th Cir.

1    2003)).  When a court uses the lodestar as a crosscheck of a percentage claim of fees, it need only

2    make a "rough calculation."  *Schiller v. David's Bridal, Inc.*, No. 10–00616, 2012 WL 2117001,

3    at *22 (E.D. Cal. Jun. 11, 2012). "Though the lodestar figure is 'presumptively reasonable,' the

4    court may adjust it upward or downward by an appropriate positive or negative multiplier

5    reflecting a host of 'reasonableness' factors." *Bluetooth,* 654 F.3d at 941–42 (citing *Hanlon*, 150

6    F.3d at 1029).  Those factors include "the quality of representation, the benefit obtained for the

7    class, the complexity and novelty of the issues presented, and the risk of nonpayment.'" *Id.*

8    "Foremost among these considerations, however, is the benefit obtained for the class." *Id.* at 942

9    (citing *Hensley v. Eckerhart*, 461 U.S. 424 (1983); *McCown v. City of Fontana*, 565 F.3d 1097,

10   1102 (9th Cir. 2009)).

11            Class counsel's initial motion for attorneys' fees did not include sufficient

12   information to conduct a complete lodestar cross-check.  At the court's direction, class counsel

13   subsequently submitted supplemental briefing to address the gaps. *See* Righetti Suppl. Decl.

14   [Final].  For the following reasons, although the court finds the requested hourly rates are not

15   reasonable for litigation of this action in this district, the court finds class counsel's overall

16   request adequately supported by the lodestar cross-check.  Below, the court evaluates the

17   reasonableness of class counsel's reported hours, hourly rates, and lodestar multiplier.

18            a.  Hours

19            Class counsel report having spent 847 combined attorney and paralegal hours in

20   order to reach the settlement.  Mot. Final Approval 21–22.  This total includes 262 hours for

21   Matthew Righetti, 400 hours for Mike Righetti, and 150 hours of paralegal time.  Class counsel

22   submit a time report that disaggregates those hours based on categories of activity. *See* Righetti

23   Decl. [Final] 46, Ex. 5, Time Rep.  Class counsel avers that, although multiple people worked on

24   the case, these reports reflect "non-duplicative" hours.  Righetti Decl. [Fees] ¶ 28.  After

25   reviewing class counsel's time report, and given the two-and-a-half year duration of the case, the

26   court is persuaded that the hours are reasonable.

27   /////

28   /////

1          b.  Hourly Rates

2                  A "district court must determine a reasonable hourly rate considering the

3      experience, skill, and reputation of the attorney requesting fees." *Chalmers v. City of*

4      *Los Angeles*, 796 F.2d 1205, 1210–11 (9th Cir. 1986), *opinion amended on denial of reh'g*,

5      808 F.2d 1373 (9th Cir. 1987).  That determination is not made "by reference to rates actually

6      charged the prevailing party," but instead to the "rate prevailing in the community for similar

7      work performed by attorneys of comparable skill, experience, and reputation." *Id.*; *see also*

8      *Adoma v. U. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 983 (E.D. Cal. 2012) (citing the attorney's

9      previously approved rates to support the reasonableness of a modestly larger rate).

10                 To reach their lodestar figure, class counsel use hourly rates of $775 for Matthew

11     Righetti, who has thirty-one years' experience, $400 for Michael Righetti, who has eight years'

12     experience, and $150 for paralegals.  Righetti Decl. [Fees] 46, Ex. 5, Time Rep..  As class counsel

13     point out, "one difficulty in determining the hourly rate of attorneys of similar skill and

14     experience in the relevant community is scarcity of hourly fee-paying clients in class action

15     litigation."  Righetti Decl. [Fees]¶ 13.  Although class counsel point to four of their previously

16     successful cases in state court, each of which granted percentage-of-recovery amounts between 33

17     1/3 percent and 40 percent, none of these cases appears to discuss hourly rates.  *See id.* at 16–

18     44,Exs. 1–4.

19                 Where, as here, a party fails to provide sufficient evidence that its rates are

20     reasonable, the court may exercise its discretion to determine reasonable hourly rates based on the

21     court's experience and knowledge of prevailing rates in the community.  *In re Toys R Us-*

22     *Delaware, Inc.--Fair and Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438,

23     463–64 (C.D. Cal. 2014); *Plan Administrator v. Kienast*, No. 2:06–cv–1529, 2008 WL 1981637,

24     *4 (W.D. Pa. May 2, 2008) ("If a party fails to meet its burden to demonstrate a prima facie case

25     that the requested rates were the prevailing rates in the community, 'the district court must

26     exercise its discretion in fixing a reasonable hourly rate'") (internal citation omitted).

27                 Here, class counsel's rates appear reasonable for other regions of the state,

28     including San Francisco and Los Angeles.  *See, e.g.*, *Prison Legal News v. Schwarzenegger*,

1   608 F.3d 446, 455 (9th Cir. 2010) (finding district court did not abuse its discretion in awarding

2   hourly rates for Bay Area attorneys of up to $875 for a partner, $700 for an attorney with 23 years

3   of experience, $425 for an attorney with approximately five years of experience, and $190 for

4   paralegals); *Gutierrez v. Wells Fargo Bank, N.A.*, 2015 WL 2438274, at *5 (N.D. Cal. May 21,

5   2015) (finding reasonable rates for Bay Area attorneys of between $475-$975 for partners, $300-

6   $490 for associates, and $150-$430 for litigation support and paralegals); *Tadepalli v. Uber*

7   *Techs., Inc.*, 15-CV-04348-MEJ, 2016 WL 1622881, at *11 (N.D. Cal. Apr. 25, 2016) (approving

8   as reasonable hourly rates of between $200 and $700 per hour depending on the particular San

9   Francisco Bay Area attorney or counsel); *Klee v. Nissan N.A., Inc.*, CV1208238AWTPJWX, 2015

10  WL 4538426, at *13 (C.D. Cal. July 7, 2015), *aff'd* Case No. 15–56201 (9th Cir.2015) (approving

11  as reasonable hourly rates ranging from $370 to $695 for attorneys in southern California);

12  *Browne v. American Honda Motor Co., Inc.*, No. CV 09–06750 MMM (DTBx), 2010 WL

13  9499073 (C.D. Cal. Oct. 5, 2010) (finding hourly rate of $545 reasonable for attorney who had

14  practiced in Los Angeles for 10 years, and $445 reasonable for attorney with 7 years' experience).

15  Class counsel appear to rely on rates from these other regions, as its supplemental briefing relies

16  heavily on the rates received by Altshuler Berzon, LLP, a San Francisco-based law firm whose

17  successful cases and cited rates generally are limited to San Francisco, San Diego, or

18  Los Angeles.  *See* Righetti Suppl. Decl. [Final] ¶¶ 9–11.

19              That said, the "relevant legal community" for the purposes of the lodestar

20  calculation is generally the forum in which the district court sits.  *Gonzalez v. City of Maywood*,

21  729 F.3d 1196, 1205 (9th Cir. 2013).  Class counsel's rates, in particular the rate of $775 per hour

22  for Matthew Righetti, the attorney with thirty-one years' experience, appear to be outside the

23  range of acceptable fees in the Eastern District of Sacramento.  *See, e.g.*, *Ontiveros v. Zamora*,

24  303 F.R.D. 356, 374 (E.D. Cal. 2014) (The requested rates of $495 to $650 "are high for even the

25  most experienced attorneys in the Eastern District"); *Joe Hand Promotions, Inc. v. Albright*, Civ.

26  No. 2:11–2260, 2013 WL 4094403, at *2 (E.D. Cal. Aug. 13, 2013) (citing Eastern District cases

27  in which judges awarded experienced attorneys rates between $275 and $400); *Adoma v. U. of*

28  *Phoenix, Inc.*, 913 F. Supp. 2d 964, 984 (E.D. Cal. 2012) (approving a $425 hourly rate for

1    employment class action because "[t]o insist on awarding significantly-lower hourly rates in the

2    Eastern District than those in the other judicial districts in California would discourage attorneys

3    from bringing meritorious lawsuits in this district"); *Vanwagoner v. Siemens Indus., Inc.*,

4    2:13-CV-01303-KJM, 2014 WL 7273642, at *11 (E.D. Cal. Dec. 17, 2014) (approving as

5    reasonable rates of $400 per hour and $300 per hour); *see also Valdez v. Neil Jones Food Co.*,

6    1:13-CV-00519-SAB, 2016 WL 4247911, at *11 (E.D. Cal. Aug. 10, 2016) ("In the Fresno

7    Division of the Eastern District of California, attorneys with experience of twenty or more years

8    of experience are awarded $350.00 to $400.00 per hour.").

9           The same may be true of the rate of $400 per hour for Michael Righetti, the

10   attorney with eight years' experience. *See, e.g.*, *Ontiveros*, 303 F.R.D. at 374 ("a reasonable rate

11   for associates working in this community is typically between $150 and $175 per hour"); *Joe

12   Hand*, 2013 WL 4094403, at *3; *Broad. Music Inc.*, 2013 WL 2244641, at *1 (awarding associate

13   $175 per hour); *Passport Health, Inc. v. Travel Med, Inc .*, 2:09–CV–01753–GEB, 2011 WL

14   6211874, at *2 (E.D. Cal. Dec. 14, 2011) (awarding hourly rate of $150 for associates a contract

15   action); *Yeager v. Bowlin*, CIV.2:08–102WBSJFM, 2010 WL 2303273, at *6 (E.D. Cal. June 7,

16   2010), *aff'd*, 495 F. App'x 780 (9th Cir. 2012) (explaining reasonable rate for associates in this

17   district is $150).

18          The same may be true of the firm's rate for paralegals, which is $150 per hour.

19   *Joe Hand*, 2013 WL 4094403, at *3 (reducing rate for paralegal from $150 to $75); *Friedman v.

20   Cal. State Emps. Ass'n*, 2:00–101 WBS DAD, 2010 WL 2880148, at *4 (E.D. Cal. July 21, 2010)

21   ("the paralegal rate 'favored in this district' is $75 per hour."); *Passport Health, Inc.*, 2011 WL

22   6211874, at *2 (awarding a rate of $75 per hour for paralegal time).

23          Accordingly, the court adjusts the hourly rates downward for the purposes of

24   conducting the lodestar cross-check.  The court uses the reasonable rates of $425 per hour for

25   Matthew Righetti, $175 per hour for Michael Righetti, and $75 per hour for paralegals.  Based on

26   class counsel's reported hours, which the court determines are reasonable, these adjusted rates

27   yield a respective lodestar of $111,350.00 for Matthew Righetti (262.00 x $425); $43,951.25 for

28

29

1    Michael Righetti (251.15 x $175); and $25,053.75 for paralegals (334.05 x $75), all of which

2    produces a combined lodestar figure of $180,355.00.

3            The court next considers whether class counsel request a reasonable lodestar

4    multiplier to justify their request of the benchmark proportion of $437,500.00.

5                    c.   Lodestar Multiplier

6            To reach counsel's requested fee of $437,500.00 requires a multiplier of 2.4 to be

7    applied to the lodestar figure of $180,355.00.  A multiplier of 2.4 is well within the range of

8    multipliers that the Ninth Circuit has accepted.  *See, e.g.*, *Vizcaino*, 290 F.3d at 1050-51

9    (reviewing approved fees from 24 cases and finding 20 of 24 fell within the 1.0–4.0 range, and 13

10   of 24 fell within the 1.5–3.0 range); *see also In re Prudential Ins. Co. Am. Sales Prac. Litig.*

11   *Agent Actions*, 148 F..3d 283, 341 (3d Cir. 1998) ("[M]ultiples ranging from one to four are

12   frequently awarded in common fund cases when the lodestar method is applied.").  The court

13   turns to the factors discussed in *Bluetooth* to determine whether a 2.4 lodestar multiplier is

14   justified in this case.

15           First, the "quality of representation":  Although the case does not appear to have

16   been heavily litigated, the court notes it was removed from state court and class counsel were

17   successful in their motion to compel and motion seeking preliminary approval for the settlement.

18   In addition, class counsel needed to navigate the potential complications posed by a pending state

19   litigation whose class members overlapped with those in the present case.  This factor supports a

20   modest, positive multiplier.

21           Second, the "benefit obtained for the class":  The proposed settlement has a gross

22   settlement value of $1,750,000, and class members stand to receive $1,253,500, the gross

23   settlement amount less requested attorneys' fees and costs.  Given that class members' out-of-

24   pocket expenses—the amount they should have received in overtime payments—is estimated at

25   only $300,000, the much larger settlement payment to the class is substantial.  Participating class

26   members, who will receive an average award of $1,000, will receive a substantial benefit, and

27   class counsel can point to the fact that they have received no opt-outs as further support.  This

28   factor favors a substantial, positive multiplier.

                                              30

1       Third, the "complexity and novelty of the issues presented":  Class counsel are

2  experienced litigators in the employment context, and the issues of overtime pay are likely not

3  novel to them.  However, the precise question at issue in this cases—whether BANA's incentive

4  bonus payments are properly classified as discretionary bonus to be included in the regular rate of

5  pay—required additional investigation.  This factor favors a small, positive multiplier.

6       Finally, "the risk of nonpayment":  Class counsel have represented the class on a

7  contingency basis.  As a result, class counsel faced a substantial risk of nonpayment, especially

8  given BANA's asserted defenses that could have undermined class certification and ultimate

9  relief, including prior releases of claims and lack of predominance of the class.  Although it is

10 difficult to evaluate the plaintiff's likelihood of success without a motion to dismiss or motion for

11 summary judgment, the risk of nonpayment appears substantial.  This factor favors a substantial,

12 positive multiplier.

13      Each of these factors favors a positive, if not a substantial, multiplier, and the

14 requested multiplier of 2.4 is within the range accepted in the Ninth Circuit.  As a result, treating

15 the lodestar cross-check as a "rough calculation," *Schiller*, 2012 WL 2117001, at *22, and

16 applying a 2.4 multiplier supports the requested fees here.

17      Class counsel will be awarded attorneys' fees in the amount of $437,500, or 25

18 percent of the common fund.

19      B.      Request for Costs

20      The court also must determine an appropriate award of costs and expenses.

21 Fed. R. Civ. P. 23(h).  "[I]n evaluating the reasonableness of costs, the judge has to step in and

22 play surrogate client."  *FACTA,* 295 F.R.D. at 469 (quoting *Matter of Cont'l Ill. Sec. Litig.*, 962

23 F.2d 566, 572 (7th Cir.1992)).  Here, class counsel request costs of $15,000.00. Mot. Att'ys' Fees

24 24.  Class counsel aver that the combined reimbursable out-of-pocket expenses amount to

25 $17,882.25, from which they rounded down to arrive at their request of $15,000.00.  *Id.*  The

26 expenses include: Photocopies/Facsimiles $746.25, Experts/Consultants $3,824.75,

27 Travel/Lodging/Rental Cars $2,425.25, Courier/Overnight Services $645.40, Court Filing Fees

28

31

1   $1,659.50, Investigation $2,245.50, Depositions $1,835.60, and Mediation $4,500.00.  *Id.* at 24.

2   The court finds the costs requested to be reasonable.

3         C.      <u>Incentive Award</u>

4             Generally speaking, incentive awards are meant to "compensate class

5   representatives for work done on behalf of the class, to make up for financial or reputational risk

6   undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a

7   private attorney general." *Rodriguez*, 563 F.3d at 958–59.  While such awards are fairly typical

8   in class action cases, *id.* at 958, the decision to approve such an award is a matter within the

9   court's discretion, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000).  In

10  determining whether to approve an incentive award, courts may consider the following factors:

11  (1) the risk to the class representative in commencing suit, both financial and otherwise; (2) the

12  notoriety and personal difficulties encountered by the class representative; (3) the amount of time

13  and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal

14  benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.  *Van

15  Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995). Various courts in this

16  circuit have adopted the *Van Vranken* factors.  *See, e.g.*, *Zakskorn v. Am. Honda Motor Co., Inc.*,

17  2:11-CV-02610-KJM, 2015 WL 3622990, at *17 (E.D. Cal. June 9, 2015); *Greater Los Angeles

18  Agency on Deafness, Inc. v. Krikorian Premiere Theatres, LLC*, CV 13-7172 PSG (ASX), 2015

19  WL 12656271, at *4 (C.D. Cal. Feb. 5, 2015); *Walsh v. Kindred Healthcare*, C 11-00050 JSW,

20  2013 WL 6623224, at *4 (N.D. Cal. Dec. 16, 2013); *Dennis v. Kellogg Co.*, 09-CV-1786-L WMC,

21  2013 WL 6055326, at *8 (S.D. Cal. Nov. 14, 2013); *Dubeau v. Sterling Sav. Bank*, 1:12-CV-

22  01602-CL, 2013 WL 4591034, at *4 (D. Or. Aug. 28, 2013); *Pelletz v. Weyerhaeuser Co.*, 592 F.

23  Supp. 2d 1322, 1329 (W.D. Wash. 2009).  As has a California appellate court.  *In re Cellphone

24  Fee Termination Cases*, 113 Cal. Rptr. 3d 510, 522 (Cal. App. 1st Dist. 2010).   The court

25  considers each of these factors to determine whether to grant plaintiff's request for an individual

26  incentive award of $10,000.  With respect to the first factor, Pointer contends that by initiating the

27  instant case, he shouldered a degree of personal risk, including professional risk.  Pointer Decl. ¶¶

28  8–9 ("Bringing cases such as these does not make you a desirable candidate for other potential

1    employers.").  Those risks are relevant factors in evaluating an incentive award request.  *See*

2    *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003).  The first factor weighs in favor of

3    granting an incentive award to Pointer.

4         With respect to the second factor, nothing in the record suggests the litigation

5    gained any particular notoriety.  This factor is neutral.  *See Ogbuehi v. Comcast, Inc.*,

6    No. 13-00672, 2015 WL 3622999, at *13 (E.D. Cal. June 9, 2015).

7         With respect to the third factor, Pointer states he engaged in significant work

8    personally in moving this case forward.  Righetti Decl. [Fees] ¶ 41.  This work included assisting

9    class counsel in contacting witnesses and gathering information in the discovery process. *Id.*

10   Pointer also participated in the full day mediation.  Pointer Decl. ¶ 4.  Pointer estimates that, over

11   the course of the litigation, he spent fifty hours helping attorneys in the case. *Id.* .  Because

12   Pointer expended reasonable efforts and was involved in the mediation, this factor weighs in

13   favor of granting an incentive award.

14         With respect to the fourth factor, the litigation of this case was not brief.  The case

15   commenced in state court in December 2013, removed to this court in February 2014, and

16   mediated in March 2015; ultimately months later, the court granted preliminary approval in

17   February 2016.  *Compare Ogbuehi*, 2015 WL 3622999, at *14 (E.D. Cal. June 9, 2015) (finding

18   neutral the fourth factor where litigation settled within one year of filing) *with Van Vranken*, 901

19   F. Supp. at 299 (granting incentive award of $50,000 for named plaintiff who participated in case

20   that spanned sixteen years) This factor favors granting a modest incentive award.

21         With respect to the fifth factor, the personal benefit a plaintiff enjoys, the court

22   finds Pointer will not gain any benefit beyond that of the class members.  *See FACTA*, 295 F.R.D.

23   at 472 (C.D. Cal. 2014) ("An incentive award may be appropriate when a class representative will

24   not gain any benefit beyond that he would receive as an ordinary class member."); *Van Vranken*

25   *v. A. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995) (finding incentive award supported by

26   named plaintiffs' modest recovery under the settlement agreement, which was only a "tiny

27   fraction" of the common fund).  In addition, Pointer agreed to a full and general release, releasing

28   BANA from far more claims than those covered by the class members.  Righetti Decl. [Fees] 15,.

1    More specifically, class members only release claims against BANA brought in the first amended

2    complaint other than the "off the clock" claims.  Jnt. Stip. for Class Action Settlement ¶ 64.  In

3    contrast, only the class representative waives his rights under California Civil Code section 1542,

4    which additionally releases claims about which Pointer may not have known at the time of the

5    release.  *Id.* at ¶ 65.  Additionally, Pointer agrees in the settlement to neither apply nor work for

6    BANA or its parent companies.  *Id.*  This factor weighs in favor of granting an incentive award.

7            On balance, the relevant factors favor granting an incentive award.  On one hand,

8    Pointer's proposed award of $10,000 appears to be higher than the average amount approved by

9    courts.  *See, e.g., In re Mego*, 213 F.3d at  463 (approving a $5,000 incentive award); *Ching*, 2014

10   WL 2926210, at *9 (approving a $5,000 incentive award as "presumptively reasonable" in the

11   Northern District); *FACTA*, 295 F.R.D. at 470 (approving a $5,000 incentive award).  On the

12   other hand, the request is less than one percent of the total recovery.[3]  This is a much smaller

13   relative amount than the award in *Staton*, where the Ninth Circuit overturned a class action

14   judgment that included an incentive award of six percent of the common fund, 327 F.3d at 976–

15   77, and less than the approved recovery in *Sandoval v. Tharaldson Employee Mgmt., Inc.* No.

16   EDCV 08-482-VAP (OP), 2010 WL 2486346, at 10 (C.D. Cal. June 15, 2010), which was a

17   $7,500 service award that represented one percent of the gross settlement.  In addition, the fact

18   that Pointer took on all responsibilities as the named plaintiff, and no other class member was

19   named a plaintiff with him, warrants a larger incentive award.  *See, e.g.*, *Gallucci v. Boiron, Inc.*,

20   No. 11–2039, 2012 WL 5359485, at *10 (S.D. Cal. Oct. 31, 2012) (awarding higher incentive

21   award to named plaintiff who contributed more time and expense in seeing the case to fruition);

22   *Hughes v. Microsoft Corp.*, No. 93–0178, 2001 WL 34089697, at *13 (W.D. Wash. Mar. 26,

23   2001) (same).

24            The court grants a $10,000 incentive award to Pointer.

25   /////

26   /////

27   _____

28          [3] $10,000 / $1,750,000 = 0.57%.

1          D.     Class Administrator's Fee

2                  Pointer also requests the court approve administrative costs in the amount of

3      $27,244.88 for Rust Consulting's work as the settlement administrator.  Mot. Final Approval 26.

4      The administrator's responsibilities included notifying a list of 1,159 potential class members of

5      the preliminarily approved settlement, resending notice for returned addresses, determining the

6      validity of the 689 claim forms received, and resolving disputes regarding amounts to be

7      distributed.  *See generally* Pikus Decl., ECF No. 51-2; Pikus Suppl. Decl. ¶ 4.  Upon final

8      approval of the settlement, Rust will distribute to 688 class members who sent valid and timely

9      forms.  Given the relatively large size of the class, the court finds the administrator's fees

10     substantially justified.  *See Ching*, 2014 WL 2926210, at *2 (approving an estimated $15,000

11     claims administrator fee for sixty-eight claims); *Ozga v. U.S. Remodelers, Inc.*, No. 0905112,

12     2010 WL 3186971, at *2 (N.D. Cal. Aug.9, 2010) (granting $10,000 to the claims administrator

13     for 156 claims); *Chu v. Wells Fargo Investments, LLC*, No. 05–4526, 2011 WL 672645, at *1

14     (N.D. Cal. Feb. 16, 2011) (granting $40,528.08 in costs for 1,320 class members and $6,900,000

15     settlement amount).  Accordingly, the court approves the class administrator fee in the amount of

16     $27,244.88.  *See Vasquez,* 266 F.R.D. at 484 (approving $25,000 administrator fee awarded in

17     wage and hour case involving 177 potential class members).

18          E.     *Cy Pres* Distribution

19                 Because most class action settlements result in unclaimed funds, a plan is required

20     for distributing those funds.  *Six (6)Mexican Workers*, 904 F.2d at 1305.  The method of *cy pres*

21     distribution allows unclaimed funds to benefit the entire class, albeit indirectly.  *Id.* at 1305.  The

22     *cy pres* doctrine requires any award to qualify as "the next best distribution" to giving the funds

23     directly to the class members.  *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012).  "Not

24     just any worthy charity will qualify as an appropriate *cy pres* beneficiary[;]" there must be "a

25     driving nexus between the plaintiff class and the *cy pres* beneficiary."  *Id.*  A *cy pres* distribution

26     is an abuse of discretion if there is "no reasonable certainty" that any class member would benefit

27     from it.  *Id.*

28     /////

35

1    As noted above, although the court preliminarily approved the use of *cy pres* for

2    distribution of payments too small to warrant pro rata distribution in its prior order, the court

3    noted the absence of a court-approved charity to act as a recipient.  Order 16 n.5.  As the court

4    wrote at the time, "[i]n principle this strategy is acceptable, although more detail will be

5    necessary before the court can approve the settlement finally, including about the proposed *cy*

6    *pres* charity."  *Id.*

7    The parties subsequently submitted a stipulation regarding *cy pres*.  As class

8    counsel explain in the stipulation, the *cy pres* beneficiary will receive funds (1) if the amount of

9    unclaimed funds from the Net Settlement Fund remaining after the payment of the employer's

10    share of payroll taxes is too small to warrant re-distribution to the class or (2) if any settlement

11    checks remain uncashed.  *Cy Pres* Stip. 2.  Although these funds may be relatively small, or even

12    zero, the court is satisfied that the parties' designated beneficiary would be "the next best

13    distribution" in the event giving the funds directly to the class members is not necessary to

14    achieve a fair outcome, all things considered.  The parties have designated Legal Aid Society –

15    Employment Law Center as the *cy pres* beneficiary.  *Id.*. The Society's mission is to "advance

16    justice and economic opportunity for low-income people and their families at work, in school,

17    and in the community."  *See* Legal Aid Society – Employment Law Center "Mission" at

18    https://las-elc.org/mission.  As part of their work, Legal Aid Society "provides about 3,000 low-

19    income workers across California with free and confidential legal services each year through a

20    variety of clinics" and provides "information and one-on-one counseling about employment rights

21    and discrimination, workplace safety, denial of wages, unemployment benefits, harassment, and

22    wrongful termination, among other issues."  *See* Legal Aid Society – Employment Law Center

23    "Get Legal Help" at https://las-elc.org/legal-help.  Although the record does not reveal the

24    geographic distribution of the class, it is a statewide class and BANA has bank locations

25    throughout the state.  Thus, because there exists a "driving nexus between the plaintiff class and

26    the *cy pres* beneficiary," the court approves Legal Aid Society as the *cy pres* beneficiary.

27    /////

28    /////

36

VII.   <u>CONCLUSION</u>

In conclusion, the court APPROVES the class settlement as follows:

1.   The court CERTIFIES the class defined above;

2.   The court GRANTS final approval of the settlement;

3.   The court AWARDS an incentive payment of $10,000.00 to the named plaintiff, Ivan Dexter Pointer;

4.   The court APPROVES Legal Aid Society – Employment Law Center as the *cy pres* beneficiary;

5.   The court AWARDS administration costs in the amount of $27,244.88 to the settlement administrator Rust Consulting;

6.   The parties and the settlement administrator shall perform their respective obligations under the terms of the settlement agreement;

7.   The court APPROVES attorneys' fees in the amount of $437,500.00; and

8.   The court APPROVES reimbursement of costs in the amount of $15,000.00.

This order resolves ECF Nos. 50 and 51.

IT IS SO ORDERED.

DATED:  December 20, 2016.

_____
UNITED STATES DISTRICT JUDGE